IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

KATHERINE M. A.,[1]
     Plaintiff,

          v.                                Civil No. 3:19cv649 (REP)

ANDREW M. SAUL,
Commissioner of Social Security,
     Defendant.

## REPORT AND RECOMMENDATION

This is an action seeking review of the decision of the Commissioner of Social Security ("Commissioner") denying the application of Katherine M. A. ("Plaintiff") for disability benefits under the Social Security Act. Plaintiff, forty-seven years old at the time of her benefits application, suffers from autism spectrum disorder and an unspecified anxiety disorder, which she asserts renders her disabled. (R. at 26.) On August 31, 2018, an Administrative Law Judge ("ALJ") denied Plaintiff's application for disability benefits. Plaintiff now seeks judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g), arguing that the ALJ erred in (1) evaluating one of her treating physician's opinion, (2) failing to include the treating physician's recommended accommodations for Plaintiff, (3) finding only a moderate limitation in concentration, persistence, and pace, and (4) finding that Plaintiff could perform the work of a maid, marker, or dishwasher. (Pl.'s Mem. in Support of Mot. For Summ. J. at 4–14, ECF No. 15 ("Pl.'s Mem.").)

This matter is before the Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) on the parties' cross-motions for summary judgment, rendering the matter ripe for

---

[1]     The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

review.[2] For the reasons that follow, the Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 13) be DENIED, Defendant's Motion for Summary Judgment (ECF No. 16) be GRANTED, and the final decision of the Commissioner be AFFIRMED.

## I. PROCEDURAL HISTORY

On January 26, 2016, Plaintiff filed an application for disability benefits, with an alleged disability onset date of April 30, 2015. (R. at 191–94.) The Social Security Administration denied Plaintiff's claim initially on July 15, 2016, and again upon reconsideration on October 21, 2016. (R. at 113, 126.) At Plaintiff's request, the ALJ held a hearing on February 14, 2018 during which Plaintiff, represented by counsel, and a vocational expert, testified. (R. at 40–100, 138.) On August 31, 2018, the ALJ issued a written opinion denying Plaintiff's disability claim. (R. at 23–35.) The ALJ concluded that Plaintiff did not qualify as disabled because Plaintiff could perform jobs that existed in significant numbers in the national economy. (R. at 34–35.) The Social Security Administration Appeals Council subsequently denied Plaintiff's request for review of the ALJ's decision, rendering the ALJ's decision as the final decision of the Commissioner and subject to review by this Court. (R. at 1–3.)

---

[2]     The administrative record in this case remains filed under seal, pursuant to E.D. Va. Loc. R. 5 and 7(C). In accordance with these Rules, the Court will endeavor to exclude any personal identifiers such as Plaintiff's social security number, the names of any minor children, dates of birth (except for year of birth), and any financial account numbers from its consideration of Plaintiff's arguments, and will further restrict its discussion of Plaintiff's medical information to only the extent necessary to properly analyze the case.

## II. FACTUAL BACKGROUND

The record before this Court contains the following relevant evidence.

### A. Plaintiff's Background

Plaintiff has suffered from autism spectrum disorder and an unspecified anxiety disorder since her childhood. (R. at 445, 492.) Plaintiff has always lived at home with her parents, who supervise and assist Plaintiff with her tasks of daily living. (R. at 77, 81–82.) Plaintiff achieved her high school diploma and received a degree from Longwood University ("Longwood"), where her parents worked. (R. at 48.) After her education, Plaintiff worked for a food service contractor at Longwood for fifteen years, but she did not earn enough to qualify for substantial gainful activity under Social Security Administration regulations. (R. at 29, 48–52.) She eventually left the position because of the job's increased stress, anxiety, and bullying by her co-workers. (R. at 52–53, 56, 62.)

### B. Plaintiff's Treatment with Dr. Almond

In April 2015, Plaintiff began seeing Dr. Maria Almond, M.D. ("Dr. Almond") for psychiatric treatment. (*See* R. at 445.) In December 2016, Dr. Almond wrote a letter concerning Plaintiff's condition, noting Plaintiff's diagnoses of autism spectrum disorder and an unspecified anxiety disorder. (R. at 445.) Dr. Almond stated that, although Plaintiff graduated from Longwood, she would not be able to attain employment consistent with a college degree because she needs "significant accommodations" to work, such as one-on-one support, structure, and routine. (R. at 445.) Dr. Almond stated that Plaintiff has experience working in food service at Longwood, but she now experiences trauma after being bullied and taunted in a work setting. (R. at 445.) Dr. Almond also observed:

> [Plaintiff] remains significantly anxious, easily distractible, and overexcitable. She continues to struggle with any deviation from routines and has challenges calming

3

after being stimulated. As such, her ability to manage employment at this time remains *severely compromised*.

(R. at 445 (emphasis added).) Dr. Almond noted "improvement" over the course of Plaintiff's eighteen-month treatment, but that "chronic conditions" existed for which Plaintiff would need continued support. (R. at 445.)

Dr. Almond continued to provide psychiatric treatment to Plaintiff throughout 2017 and maintained treatment notes during these visits. (R. at 476–94.) During this time, Dr. Almond consistently observed that Plaintiff had normal speech, normal recent and remote memory, appropriate vocabulary, and was goal-directed. (*See, e.g.,* R. at 478, 481, 484.) Dr. Almond further noted that Plaintiff had difficulties with transitioning away from routines, reading emotional cues, and calming herself when excited. (*See, e.g.,* R. at 477, 479, 483, 485.) Dr. Almond opined that Plaintiff needed "extended time for many tasks" and "specific supportive services in [the] work place to ensure stability of routine, appropriate supervision and available support/guidance." (R. at 479, 485.)

## C. Plaintiff's Testimony

At the February 2018 hearing with the ALJ, Plaintiff testified that she completed high school and got her college degree from Longwood, though she required accommodations such as one-on-one supervision to do so. (R. at 48.) Plaintiff stated that she engaged in some extracurricular activities during her education, including some overnight trips without her parents. (R. at 65.) Plaintiff also enjoyed volunteering at Longwood sporting events, where she performed duties of a ticket taker, program distributor, and scorekeeper. (R. at 86.) Plaintiff further testified that she operates a "Ham" or "amateur" radio as a hobby and volunteered for the Virginia Military Radio affiliate system, where she assisted with emergency situations. (R. at 69.)

After her education, Plaintiff worked for fifteen years with a food service contractor for Longwood. (R. at 48–49.) Plaintiff's primary responsibilities were in food preparation and as a cashier. (R. at 48–49) She testified that, in these roles, she received "help initially but there was no supervision after [help] was given." (R. at 49.) Plaintiff noted that, while the work was stressful during her entire fifteen-year tenure at Longwood, it grew increasingly stressful during the last five years. (R. at 52.) Plaintiff testified that her managers often "did not know where to keep [her]" at work and that she experienced frequent positional changes, which caused her anxiety. (R. at 49–50.) Eventually, increased bullying and taunting by her co-workers and her manager exacerbated her stress and anxiety, and Plaintiff had to stop working at Longwood. (R. at 56, 62.)

Plaintiff testified that she now takes medications that help her relax and focus better. (R. at 58–59.) She stated that she can drive, and that she goes to medical appointments on her own. (R. at 59, 67.) She noted that she went out once recently by herself for a social activity, though such an outing is rare for her. (R. at 59–60.) She stated that she needs help from her parents to pay bills and go shopping, and that, although she can perform her household chores, she needs constant reminders to do so. (R. at 60–61.) She testified that she can prepare simple microwave meals or help her parents cook. (R. at 68.)

Finally, Plaintiff testified that, when she first began working, she enjoyed the independence it gave her. (R. at 62–63.) However, Plaintiff doubts her ability to work now, and noted that Dr. Almond told her she is unable to work. (R. at 87–88.)

### D.  Testimony of Plaintiff's Mother

Plaintiff's mother, Edith Ann C. A. ("Plaintiff's Mother"), also testified at the hearing. (R. at 73.) Plaintiff's Mother testified that she frequently helped Plaintiff with her high school and

college education. (R. at 74.) She stated that, despite Plaintiff's degree, Plaintiff cannot do any meaningful work commensurate with her college education. (R. at 81.)

Plaintiff's Mother stated that Plaintiff can be "easily distracted" at work, and that Plaintiff eventually stopped working at Longwood because she was bullied, threatened, and even had her car vandalized at work. (R. at 75–76.) She testified that Plaintiff suffered panic attacks as a result of the bullying and intimidation. (R. at 77.)

Plaintiff's Mother further stated that she regularly supervises Plaintiff with her household chores, but that it often upsets Plaintiff to tell her to re-do a chore. (R. at 77.) Plaintiff's Mother stated that Plaintiff could not live on her own without supervision. (R. at 81–82.)

### E. Vocational Expert's Testimony

After hearing testimony from Plaintiff and Plaintiff's Mother, the ALJ examined a vocational expert, posing several hypothetical questions. (R. at 92–95.) The ALJ presented a hypothetical individual who shared the same age, education, and past jobs as Plaintiff; has no exertional limitations; is limited to simple, routine tasks and simple, work-related decisions with few workplace changes; is limited to occasional interaction with the general public and frequent interactions with coworkers; and cannot perform work at a "fixed production rate pace." (R. at 92, 94.) The vocational expert responded that jobs such as maid, marker, or dishwasher existed in significant numbers in the national economy for such an individual. (R. at 93–94.)

The ALJ then added to the hypothetical that the individual would require "additional supervision, as far as remaining on-task," that "occurs on an occasional basis." (R. at 94.) The vocational expert responded that, in an unskilled position, the typical employee has

> supervision in the morning to direct them to what has to be performed. They are checked on mid-morning; checked on around lunchtime, either before or after, and then mid-afternoon and then at the end of the day. That could add up to occasional supervision, checking to make sure the work is performed and also, if there any

issues or problems, the supervisor would come to handle that or to take some sort
of action to correct the problem . . . .

(R. at 94.) The vocational expert added that any supervision "beyond that" would amount to a
"sheltered workshop" with "frequent supervision." (R. at 95.)

### III. THE ALJ'S DECISION

Following the evidentiary hearing, the ALJ issued a written opinion on August 31, 2018,
concluding that Plaintiff did not qualify as disabled under the Social Security Act and denying her
benefits. (R. at 23–35.) The ALJ followed the five-step evaluation process established by the Social
Security Act to determine whether disability exists. (R. at 24–35); 20 C.F.R. § 404.1520(a)(4); *see*
*Mascio v. Colvin*, 780 F.3d 632, 634–35 (4th Cir. 2015) (describing the five-step sequential
evaluation).

According to those regulations, at step one, the ALJ looks at the claimant's current work
activity. § 404.1520(a)(4)(i). At step two, the ALJ asks whether the claimant's medical
impairments meet the regulations' severity and duration requirements. § 404.1520(a)(4)(ii). At
step three, the ALJ determines whether the claimant's medical impairments meet or equal an
impairment in the Listings.[3] § 404.1520(a)(4)(iii); *see* 20 C.F.R. Pt. 404, Subpt. P, App. 1. Between
steps three and four, the ALJ must assess the claimant's residual functional capacity, accounting
for the most that the claimant can do despite her physical and mental limitations. §§ 404.1520(e),
404.1545(a)(1). At step four, the ALJ assesses whether the claimant can perform her past work
given her residual functional capacity. § 404.1520(a)(4)(iv). Finally, at step five, the ALJ

---

[3]     The Listings are a regulatory appendix of "the major body systems impairments that [the
Social Security Administration] consider[s] to be severe enough to prevent an individual from
doing any gainful activity." § 404.1525(a).

determines whether the claimant can perform any work existing in the national economy. § 404.1520(a)(4)(v).

In the instant case, at step one, the ALJ determined that Plaintiff has not engaged in substantial gainful activity since April 30, 2015, which is the alleged onset date of her impairments. (R. at 25.)

At step two, the ALJ concluded that Plaintiff suffers from autism spectrum disorder and unspecified anxiety disorder, which significantly limit Plaintiff's ability to perform basic work activities. (R. at 26.)

At step three, the ALJ determined that none of Plaintiff's impairments, individually or in combination, met or equaled a disability listing in the Listings, located at 20 C.F.R. Part 404, Subpart P, Appendix 1—specifically, Listings 12.06 (anxiety and obsessive-compulsive disorder) and 12.10 (Autism spectrum disorder). (R. at 26.) In rendering this conclusion, the ALJ reasoned, in part, that Plaintiff has a moderate limitation in concentration, persistence, or maintaining pace. (R. at 27.) In rendering this moderate limitation, the ALJ noted Plaintiff's testimony that she needs reminders and supervision from her parents to perform household chores. (R. at 27.) The ALJ further observed:

> As noted above, the claimant exhibited generally intact cognitive functioning evidenced by average standardized testing results, which in turn indicates an intact ability to concentrate, persist, and maintain pace. . . . The claimant described hobbies, volunteer work, and activities of daily living consistent with intact abilities in this functional area. Examples include watching television, performing household chores, watching sporting events, crocheting, babysitting, driving a motor vehicle independently, and being a "Ham" radio operator. Further, as discussed above, the claimant successfully graduated high school and college (albeit, with special accommodations) and worked fifteen years as a cashier and food preparer in a cafeteria (again, with reported special accommodations) . . . .

(R. at 27.) The ALJ also mentioned Plaintiff's medication, which helps her focus, and that she is "easily distracted and show[s] signs of tangential thought processes." (R. at 27.) The ALJ therefore

8

concluded that, "[o]n balance," Plaintiff only had a moderate limitation in concentration, persistence, or pace. (R. at 27.)

> After step three, the ALJ determined that Plaintiff has the residual functional capacity to
>
> perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant is able to perform simple and routine tasks, only simple work-related decisions with few workplace changes; the claimant can have no interaction with the general public and can have frequent interaction with co-workers and supervisors; *the claimant can perform no work at a fixed production rate pace; and the claimant requires additional supervision to stay on task on an occasional basis.*

(R. at 28 (emphasis added).)

In explaining the residual functional capacity determination, the ALJ first addressed Plaintiff's testimony that she is unable to deal with typical changes in a normal work setting, given her anxiety and inability to focus. (R. at 28–29.) Although Plaintiff stated that her symptoms leave her unable to perform full-time work, the ALJ reasoned that she has average intellectual and cognitive abilities based on her average scores on IQ and standardized tests, and that her medication helps her cope with life stressors and anxiety. (R. at 31.) The ALJ further noted Plaintiff's testimony and treatment notes that she is interested in full-time, repetitive work as a way to provide structure and independence. (R. at 31.) The ALJ also pointed out Plaintiff's ability to perform activities—such as operating a "Ham" radio, performing household chores, and volunteering at Longwood sporting events—as evidence consistent with intact mental functioning. (R. at 31.)

The ALJ also examined the medical records in the evidence, including Dr. Almond's treatment notes and Dr. Almond's December 2016 letter. (R. at 30, 32.) The ALJ generally cited to Dr. Almond's conclusions that Plaintiff suffers from "impaired cognitive functioning and inability to concentrate and cope" with life stressors and the ALJ agreed with Dr. Almond's

assessment that Plaintiff requires "additional supervision when performing simple and routine tasks." (R. at 30, 32–33 .) However, the ALJ gave only partial weight to Dr. Almond's December 2016 letter, which concluded that Plaintiff's ability work is "severely compromised." (R. at 32.) The ALJ explained:

> Dr. Almond's [December 2016] opinion . . . is partially inconsistent with the record, including Dr. Almond's own treatment notes, which document generally intact mental functioning. Dr. Almond's clinical findings include the claimant displaying normal speech, appropriate vocabulary, goal directed and intact thought associations, normal thought content, intact recent and remote memory, and intact insight and judgment. . . . The lack of notable objective findings in Dr. Almond's treatment notes are inconsistent with her assessment that the claimant is virtually unable to deal with deviation in a routine or normal work-place challenges. In addition, the claimant's reports of activities of daily living, her prior work, and her report at the hearing of improved mental symptoms . . . with prescription medication treatment are inconsistent with limitations set forth in Dr. Almond's December 2016 opinion . . . .

(R. at 31–32.)

Finally, the ALJ noted state consultant opinions that Plaintiff could perform simple and routine work tasks with appropriate supervision. (R. at 32.) However, based on the record, the ALJ determined that the state consultants' opinions should have "additional limitations in the residual functional capacity, *including no fast-paced production work*, the requirement for occasional supervision during the workday, and more restrictive social limitations." (R. at 32 (emphasis added).)

At step four, the ALJ concluded that Plaintiff had no past relevant work. (R. at 33.)

At step five, the ALJ held that there were jobs that existed in significant numbers in the national economy for Plaintiff to perform. (R. at 34.) The ALJ agreed with the vocational expert's testimony that Plaintiff could work as a maid, marker, dishwasher, or cleaner/sweeper. (R. at 34.) The ALJ therefore concluded that the Plaintiff was not disabled under the Social Security Act.

# IV. STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, a court "will affirm the Social Security Administration's disability determination 'when an ALJ has applied correct legal standards and the ALJ's factual findings are supported by substantial evidence.'" *Mascio*, 780 F.3d at 634 (quoting *Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d 337, 340 (4th Cir. 2012)). Substantial evidence requires more than a scintilla but less than a preponderance; it means enough relevant evidence that a reasonable mind could accept as adequate to support a conclusion. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). The substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts. An administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." *Dunn v. Colvin*, 607 F. App'x. 264, 266 (4th Cir. 2015) (quoting *Clarke v. Bowen*, 843 F.2d 271, 272–73 (8th Cir. 1988)).

To determine whether substantial evidence exists, the court must examine the record as a whole, but it may not "undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Hancock*, 667 F.3d at 472 (quoting *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005)). In considering the decision of the Commissioner, the court must take into account "whatever in the record fairly detracts from its weight." *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951)). The Commissioner's findings as to any fact, if substantial evidence in the record supports the findings, bind the reviewing court to affirm regardless of whether the court disagrees with such findings. *Hancock*, 667 F.3d at 476. If substantial evidence in the record does not support the ALJ's determination or if the ALJ has made an error of law, the court must reverse the decision. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

**V. ANALYSIS**

In her appeal to this Court, Plaintiff argues that the ALJ erred in (1) evaluating Dr. Almond's December 2016 letter opinion, (2) failing to include Dr. Almond's recommended accommodations for Plaintiff, (3) finding only a moderate limitation in concentration, persistence, and pace, and (4) finding that Plaintiff could perform the work of a maid, marker, or dishwasher. (Pl.'s Mem. at 4–14.) For the reasons set forth below, the Court finds that the ALJ did not err in denying the Plaintiff's application for benefits.

**A.      The ALJ Did Not Err in Evaluating Dr. Almond's Opinion.**

Plaintiff argues that the ALJ erroneously evaluated the opinion of Dr. Almond, one of Plaintiff's treating physicians. (Pl.'s Mem. at 4–8.) She contends that the ALJ should have given Dr. Almond's opinion controlling or great weight, rather than partial weight. (Pl.'s Mem. at 5.) For instance, Plaintiff argues the ALJ erroneously identified Dr. Almond's treatment notes as documenting "intact mental functioning" despite Dr. Almond consistently diagnosing Plaintiff with an intellectual impairment and an inability to concentrate. (Pl.'s Mem. at 6–7.)

Defendant argues that substantial evidence supports the ALJ's evaluation of Dr. Almond's opinion. (Def.'s Mot. for Summ. J. and Br. in Supp. Thereof at 11, ECF No. 16 ("Def.'s Mem.").) Defendant asserts that the ALJ's evaluation was "balanced" by recognizing Plaintiff's limitations, while also noting Plaintiff's ability to have normal thought, memory, and judgment. (Def.'s Mem. at 11–12.) Defendant contends that the ALJ accurately noted the inconsistency between Dr. Almond's opinions and treatment notes and Plaintiff's testimony, and that certain medication helped Plaintiff with thinking and focusing. (Def.'s Mem. at 13–15.) Finally, Defendant argues that the ALJ correctly observed the inconsistency between Dr. Almond's opinion and those of the

12

state agency consultants, who opined that Plaintiff could perform simple, unskilled work. (Def.'s Mem. at 16.)

Generally, a reviewing court should not disturb an ALJ's decision regarding the weight given to a medical opinion "absent some indication that the ALJ has dredged up 'specious inconsistencies,' or has failed to give a sufficient reason for the weight afforded a particular opinion." *Dunn*, 607 F. App'x at 267 (citing *Scivally v. Sullivan*, 966 F.2d 1070, 1077 (7th Cir. 1992)). An ALJ's decision regarding weight afforded to a medical opinion "should remain untouched unless the ALJ failed to give a sufficient reason for the weight afforded." *Keaton v. Colvin*, Civ. No. 3:15cv588, 2016 WL 8452663, at *4 (E.D. Va. July 11, 2016); *see* § 404.1527(d). However, "[a]n ALJ may not substitute his own lay opinion for a medical expert's when evaluating the significance of clinical findings." *Arakas v. Comm'r, Soc. Sec. Admin.*, 983 F.3d 83, 108 (4th Cir. 2020).

When analyzing medical opinions during the sequential analysis, an ALJ must give controlling weight to a treating physician's opinion if the it is (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques," and (2) "not inconsistent with the other substantial evidence." § 404.1527(c)(2); *see Arakas*, 983 F.3d at 107; SSR 96-2p, 1996 WL 374188 (July 2, 1996).[4] Regarding this second requirement, the treating physician's opinion must be "*contradicted* by the other substantial evidence in the record." *Arakas*, 983 F.3d at 107. Thus, to give a treating physician's opinion less than controlling weight, it is insufficient for an ALJ to

---

[4]	Effective March 27, 2017, the Social Security Administration rescinded SSR 96-2p and what is known as the "treating physician rule." 82 Fed. Reg. 5844-01, at 5844-45, 5854-55 (Jan. 18, 2017). Plaintiff filed her application for benefits in January 2016, before the Social Security Administration rescinded the rule. (R. at 191.) Thus, this Court applies the prior regulation—the treating physician rule—to analyze Plaintiff's arguments as to Dr. Almond's opinion.

observe there is a lack of objective evidence supporting the opinion; rather, the ALJ must identify "persuasive contradictory evidence." *Id.* (quoting *Coffman*, 829 F.2d at 517).

If an ALJ does not give the treating physician's opinion controlling weight, the ALJ must determine the appropriate weight based on the following factors: (1) the length of the treating source relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) supportability based upon the medical record; (4) consistency between the opinion and the medical record; (5) any specialization on the part of the treating source; and (6) any other relevant factors brought to the ALJ's attention which tend to support or contradict the medical opinion. § 404.1527(c)(2)–(6); *see Arakas*, 983 F.3d at 106.

> While an ALJ is not required to set forth a detailed factor-by-factor analysis in order to discount a medical opinion from a treating physician, it must nonetheless be apparent from the ALJ's decision that he meaningfully considered *each* of the factors before deciding how much weight to give the opinion.

*Dowling v. Comm'r Soc. Sec. Admin.*, No. 19-2141, 2021 WL 203371, at *5 (4th Cir. Jan. 21, 2021) (first citing *Arakas*, 983 F.3d at 107 n.16; and then citing *Newton v. Apfel*, 209 F.3d 448, 456 (5th Cir. 2000)).

In the instant case, Dr. Almond—one of Plaintiff's treating physicians—opined in a December 2016 letter that Plaintiff struggles with "*any* deviation from routines" and thus "her ability to manage employment at this time remains *severely compromised*." (R. at 445 (emphases added).) The ALJ gave this portion of Dr. Almond's opinion partial weight. (R. at 32.)

The ALJ did not err in giving Dr. Almond's December 2016 opinion less than controlling weight because the ALJ relied on substantial evidence that contradicted Dr. Almond's "severely compromised" conclusion. In the year following the December 2016 opinion, Dr. Almond's treatment notes consistently observed that Plaintiff had normal speech, was goal-directed, had normal recent and remote memory, appropriate vocabulary, and challenges with transitioning away

from routines. (R. at 477–94.) Dr. Almond also noted that Plaintiff needed "specific supportive services in [the] work place to ensure stability of routine, appropriate supervision and available support/guidance." (R. at 479.) Unlike Dr. Almond's December 2016 opinion, her treatment notes acknowledge the possibility that Plaintiff can work, with appropriate support. The ability to work with appropriate support contradicts a conclusion that Plaintiff's ability to work is "severely compromised."

Further, the ALJ relied on Plaintiff's testimony, which contradicted Dr. Almond's December 2016 opinion. At the hearing, Plaintiff testified that she engaged in some extracurricular activities on her own in college, volunteered at sporting events, and that she operates a "Ham" radio. (R. at 69, 86.) Plaintiff also testified that she worked at Longwood for fifteen years, until the bullying by her co-workers became intolerable. (R. at 48–50.) Plaintiff stated that working was stressful "the whole time" during her fifteen years of work, but that the last five years made her leave the job, given the increased bullying and positional changes that elevated her stress. (R. at 52–53, 56, 62.)

Thus, according to this testimony, the ALJ determined that Plaintiff has the ability to work, absent bullying or significant deviations from routine. (R. at 31.) Such accommodations are consistent with Dr. Almond's recommendation for "specific supportive services" in Plaintiff's work setting, but they contradict a conclusion that Plaintiff's ability to work is "*severely compromised*." (*See* R. at 445 (emphasis added).) Stated differently, the evidence shows that Plaintiff, although stressed by deviations from routine, was able to still work, which is inconsistent with Dr. Almond's "severely compromised" conclusion. The ALJ was therefore entitled to rely on Dr. Almond's own treatment notes and Plaintiff's testimony regarding her extracurricular

activities, volunteering, and previous work experience as evidence that contradicted Dr. Almond's December 2016 opinion in order to give such opinion less than controlling weight.

The ALJ also did not fail to consider the factors in Section 404.1527(c)(2)–(6) in deciding to give partial weight to Dr. Almond's December 2016 opinion. The ALJ considered the first two factors, relating to the treatment relationship, because the ALJ noted Dr. Almond gave Plaintiff "outpatient psychiatric care during the adjudicatory period" from "December 2016 through October 2017." (*See* R. 30.) The ALJ considered the third and fourth factors, which look to supportability and consistency, by noting the inconsistency of Dr. Almond's December 2016 opinion with Plaintiff's testimony and Dr. Almond's treatment notes. (*See* R. at 32–33.) Finally, the ALJ considered the fifth factor, specialization of the treating source, by noting that Dr. Almond gave "psychiatric care" and citing to records which indicated that Dr. Almond had a specialty in clinical psychiatry. (*See* R. at 30, 32–33 (citing R. at 445, 472–95).) Although the ALJ did not conduct an explicit factor-by-factor analysis, the ALJ meaningfully considered the factors and adequately supported the decision to give the December 2016 opinion partial weight. The ALJ therefore did not err in evaluating Dr. Almond's December 2016 opinion.

**B.     The ALJ Did Not Err in Failing to Incorporate Dr. Almond's Recommended Accommodations.**

Plaintiff argues that the ALJ failed to consider Dr. Almond's opinion that Plaintiff needs accommodations to work and failed to include this limitation in the hypotheticals posed to the vocational expert. (Pl.'s Mem. at 8.) Specifically, Plaintiff asserts that the ALJ failed to consider Dr. Almond's recommendation that Plaintiff needs "extended time for many tasks." (Pl.'s Mem. at 8 (quoting R. at 480, 483, 486, 488–89, 491–92).) Although the ALJ stated that Plaintiff could not perform work at a "fixed production rate pace," Plaintiff contends that such limitation does not adequately incorporate Dr. Almond's "extended time" limitation. (Pl.'s Mem. at 9.)

16

Defendant argues that the ALJ was not required to include Dr. Almond's recommended accommodations because the ALJ gave only given partial weight to Dr. Almond's December 2016 opinion, and therefore the ALJ had to incorporate only the portions of Dr. Almond's opinion that were consistent with the record. (Def.'s Mem. at 16–17.) Defendant also notes that the ALJ accounted for Plaintiff's difficulties with a changing work setting by limiting her to simple and routine tasks, with little social interaction. (Def.'s Mem. at 18.) Further, Defendant asserts that the ALJ encapsulated Dr. Almond's "extended time" recommendation by stating that Plaintiff could not work at a "fixed production rate of pace." (Def.'s Mem. at 20–24.)

Plaintiff's argument challenges the ALJ's failure to incorporate Dr. Almond's suggested accommodation that Plaintiff needs "extended time for many tasks" in both (1) the residual functional capacity and (2) the hypothetical questions posed to the vocational expert. The Court will address each argument in turn.

After step three of the ALJ's analysis, but before making a determination whether the claimant can perform past relevant work, the ALJ must assess the claimant's residual functional capacity. § 404.1545(a)(1). Residual functional capacity "is 'the most' the claimant 'can still do despite' physical and mental limitations that affect her ability to work." *Mascio*, 780 F.3d at 635 (quoting § 416.945(a)(1)). In analyzing a claimant's abilities, the ALJ must first assess the nature and extent of the claimant's physical limitations and then determine the claimant's residual functional capacity for work activity on a regular and continuing basis. § 404.1545(b). The ALJ may rely on both medical evidence in the record and the claimant's credible testimony to determine the residual functional capacity. § 404.1545(e). However, the "final responsibility" for determining the residual functional capacity of a claimant lies with the ALJ and not a medical provider. § 404.1527(d)(2).

In the instant case, the ALJ did not err in failing to include Dr. Almond's recommendation that Plaintiff needs "extended time for many tasks" verbatim in the residual functional capacity determination. Contrary to Plaintiff's arguments, the residual functional capacity formulated by the ALJ contemplated Plaintiff's inability to complete tasks in normal amount of time. In the residual functional capacity, the ALJ provided that Plaintiff "can perform no work at a fixed production rate pace; and the claimant requires additional supervision to stay on task on an occasional basis." (R. at 28.) The requirement of supervision for Plaintiff to "stay on task" implies that Plaintiff is easily distracted, which would increase the typical amount of time needed for Plaintiff to perform tasks. Moreover, the ALJ stated that Plaintiff cannot perform work requiring a "*fixed* production rate pace." (R. at 28 (emphasis added).) In other words, Plaintiff cannot always perform certain work tasks within a specific time period. Again, this limitation necessarily implies that Plaintiff needs more than the typical amount of time to complete a task.

Plaintiff argues that the phrase "fixed production rate pace" is ambiguous, relying on *Thomas v. Berryhill*, 916 F.3d 307 (4th Cir. 2019). In that case, the ALJ determined a residual functional capacity that limited the claimant, in part, to "no work requiring a production rate or demand pace." *Id.* at 310. The claimant appealed the ALJ's denial of benefits, contending that the ALJ failed to provide a logical explanation of how the ALJ weighed the evidence and determined the residual functional capacity. *Id.* at 311. The Fourth Circuit agreed, in part because the ALJ did not provide enough information to understand what the meaning of the phrase "production rate or demand pace." *Id.* at 312.

However, the *Thomas* holding "did not create a categorical rule that failing to define certain terms constitutes a reversible error." *Taylor v. Saul*, No. 3:19-CV-468, 2020 WL 4340536, at *6 (E.D. Va. July 27, 2020). Instead, the Fourth Circuit has clarified that a reviewing court's ability

to understand phrases such as "production rate of pace" in an ALJ's opinion depends on the phrase's context and use. In *Sizemore v. Berryhill*, for example, the Fourth Circuit affirmed the ALJ's residual functional capacity determination that limited the claimant to "non-production jobs." 878 F.3d 72, 81 (4th Cir. 2017). The Fourth Circuit later reconciled *Sizemore* with *Thomas*:

> [I]n contrast to this case and to *Thomas*, the ALJ in *Sizemore* provided additional context, explaining that the claimant could perform work only in a "low stress" setting, without any "*fast-paced work*" or "public contact," to account for moderate limitations in concentration, persistence and pace.

*Perry v. Berryhill*, 765 F. App'x 869, 872 n.1 (4th Cir. 2019) (emphasis added.)

Similarly, the ALJ in *Taylor* provided sufficient context for the limitation that the claimant "cannot perform work at a production rate pace, but she can complete goal-oriented work." 2020 WL 4340536, at *6 (internal quotation marks omitted). This Court held that the ALJ's contrast between "production rate pace" and "goal-oriented work" was sufficient to allow the Court to "understand the distinction between the terms the ALJ described." *Id*. The Court also noted that the ALJ discussed the claimant's "ability to complete tasks, even though she had difficulties performing at a *fast pace*." *Id.* (emphasis added). *But see Kane v. Saul*, No. 3:18CV746, 2019 WL 7562760, at *16 (E.D. Va. Aug. 20, 2019) (finding that the ALJ failed to explain the meaning of the phrase, "non-production oriented work setting"), *report and recommendation adopted*, No. 3:18-CV-746, 2020 WL 130134 (E.D. Va. Jan. 10, 2020).

In the instant case, this Court can understand the phrase "fixed production rate pace" included in the residual functional capacity determination. Unlike the limitation in *Thomas*, the ALJ here included the term "fixed," which permits this Court to understand that Plaintiff cannot always perform certain work tasks within a time allotment. Plaintiff has difficulty meeting the time goals of certain tasks, and thus she may need more time for such tasks.

Like in *Taylor*, the ALJ here also provided context for the phrase "fixed production rate of pace." The ALJ stated in the residual functional capacity determination: "claimant can perform no work at a fixed production rate pace; and the claimant requires additional supervision to *stay on task* on an occasional basis." (R. at 28 (emphasis added).) Plaintiff's inability to work at a "fixed" rate is thus related to her limitation of staying on task, which affects the time needed to complete a task. The ALJ also explained in its opinion: "based on totality of the evidence, the undersigned included additional limitations in the residual functional capacity, including *no fast-paced* production work . . . ." (R. at 32 (emphasis added).) The term "fast" connotes a temporal limitation for Plaintiff's ability to work, so she therefore needs "extended time" to perform certain work. *See Perry*, 765 F. App'x at 872 n.1 (noting that the phrase "fast-paced work" provided, in part, additional context to understand the ALJ's use of the phrase "non-production jobs"); *Taylor*, 2020 WL 4340536, at *6 (same). The ALJ thus adequately incorporated Dr. Almond's recommendation that Plaintiff needs "extended time for many tasks."

Plaintiff also argues that the ALJ should have included Dr. Almond's recommendation of "extended time for many tasks" in its hypotheticals posed to the vocational expert. As analyzed above, however, the ALJ incorporated Plaintiff's need for extended time by limiting Plaintiff to "no work at a fixed production rate of pace" and including her limitations in staying on task. In posing its hypotheticals to the vocational expert, the ALJ mentioned Plaintiff's inability to work at a "fixed production rate of pace" and stay on task. (*See* R. at 92–94.)

Even assuming the ALJ erred in failing to include Plaintiff's need for "extended time" verbatim in the residual functional capacity, the ALJ has no obligation to present a literal recitation of such a phrase in its hypotheticals. *See, e.g.*, *Russell v. Barnhart*, 58 Fed. App'x 25, 30–31 (4th Cir. 2003) (finding that the ALJ adequately captured the plaintiff's diminished intellectual capacity

20

by including limitations in the hypothetical about the plaintiff's ability to maintain attention); *Yoho v. Comm'r of Soc. Sec.*, No. 98-1684, 1998 WL 911719, at *3 (4th Cir. Dec. 31, 1998) (unpublished opinion) ("There is no obligation, however, to transfer the findings [from claimant's medical records or assessments] verbatim to the hypothetical questions.").

Because the ALJ adequately incorporated Plaintiff's limitation to complete tasks on a fixed time schedule into the residual functional capacity determination and the hypotheticals posed to the vocational expert, the ALJ did not err in failing to expressly include Dr. Almond's recommendation that Plaintiff needs "extended time for many tasks."

**C.   The ALJ Did Not Err in Concluding Plaintiff Has Only a Moderate Limitation in Concentration, Persistence, and Maintaining Pace.**

Plaintiff argues that the ALJ erred in determining that Plaintiff has only a moderate limitation in concentration, persistence, and maintaining pace. (Pl.'s Mem. at 9.) Specifically, Plaintiff contends that the ALJ erroneously relied on Plaintiff's "intact cognitive functioning" as evidence of Plaintiff's ability to stay on task, when such evidence only shows her ability to merely perform simple tasks. (Pl.'s Mem. at 10.) Plaintiff asserts that she is easily distracted, has tangential thought processes, and her ability to do daily activities are qualified by an inability to stay on task without reminders or other support. (Pl.'s Mem. at 10–11.)

Defendant argues that substantial evidence supports the ALJ's inclusion of a moderate limitation in concentration, persistence, and pace. (Def.'s Mem. at 24–25.) Defendant points to Plaintiff's ability to graduate from Longwood, make simple meals, work in food service, take standardized tests, and achieve average IQ scores as evidence that Plaintiff can sustain concentration on work tasks. (Def.'s Mem. at 24–25.) Defendant also notes state consultant opinions that Plaintiff has a moderate limitation in concentration, persistence, or pace. (Def.'s Mem. at 25.)

Social Security Administration regulations provide five degrees of an individual's limitation to perform a certain function: (1) no limitation, (2) mild limitation, (3) moderate limitation, (4) marked limitation, and (5) extreme limitation. Pt. 404, Supt. P, App. 1, § 12.00(F)(2)(a)-(e). The ALJ in the instant case stated that Plaintiff has a "moderate limitation" in concentration, persistence, and maintaining pace. A moderate limitation is defined as: "Your functioning in this area independently, appropriately, effectively, and on a sustained basis is *fair*." *Id*. § 12.00(F)(2)(c) (emphasis added). Plaintiff argues that the ALJ should have given her a more restrictive limitation in concentration, persistence, and maintaining pace. A marked limitation, for instance, provides that the claimant is "seriously limited" in performing a specific function. *Id*. § 12.00(F)(2)(d).

In determining that Plaintiff has a moderate limitation in concentration, persistence, or maintaining pace, the ALJ reasoned that, although Plaintiff needed reminders and supervision to perform household tasks, she had average standardized test results, her medications help her focus, she was able to graduate from college, she worked for fifteen years, and she has the ability to drive, operate a "Ham" radio, and do other daily activities. (R. at 27.)

Substantial evidence supports the ALJ's conclusion that Plaintiff has a moderate limitation in concentration, persistence, and maintaining pace. The ALJ appropriately balanced the evidence demonstrating Plaintiff's limitations with the evidence demonstrating Plaintiff's abilities in order to conclude that Plaintiff's ability to concentrate or maintain pace was "fair." Regarding Plaintiff's limitations, for example, the ALJ noted Plaintiff's and Plaintiff's Mother's testimony that Plaintiff needs reminders to perform certain tasks, such as performing her chores, and Plaintiff is otherwise "easily distracted." (R. at 60–61, 74–75, 77.) Plaintiff's Mother further testified that she doubts Plaintiff could live on her own without supervision. (R. at 81–82.)

22

The ALJ then correctly noted evidence that, with some supervision, Plaintiff has the ability to concentrate and maintain pace on work-related tasks. Plaintiff was able to complete high school and college, with the help of one-on-one supervision. (R. at 48.) She was also able to work in food preparation and as a cashier for Longwood, where she received "help initially but . . . [received] no supervision after it was given." (R. at 49.) This testimony is consistent with Plaintiff's other activities—operating a "Ham" radio or volunteering at sporting events—where Plaintiff was able to complete these tasks after receiving some guidance and supervision. In short, with some supervision, Plaintiff has some ability to concentrate and maintain pace for a variety of academic, work-related, and extracurricular tasks.

Furthermore, the evidence would not support the ALJ providing a more restrictive limitation. A marked limitation—one degree above a moderate limitation—means the claimant's ability to perform a function is "seriously limited." Pt. 404, Supt. P, App. 1, § 12.00(F)(2)(d). As analyzed above, substantial evidence supports the ALJ's rejection of Dr. Almond's "severely compromised" conclusion regarding Plaintiff's ability to work. It would be contradictory for the ALJ to reject this "severely compromised" conclusion, yet give Plaintiff a "seriously limited" limitation in concentration, persistence, or maintaining pace, as the Plaintiff argues to this Court. Plaintiff's ability to concentrate and maintain is not "seriously limited" if she is able to perform tasks—such as working in food preparation or as a cashier—with some supervision.

In summary, the evidence in the record demonstrates both Plaintiff's limitations and abilities to concentrate, persist, and maintain pace. Substantial evidence therefore supports the ALJ's balancing of this evidence to conclude that Plaintiff had a moderate limitation in concentration, persistence, and maintaining pace.

**D.      The ALJ Did Not Err in Concluding that Plaintiff Could Perform the Jobs of Maid, Marker, or Dishwasher.**

Plaintiff argues that the ALJ erred at step five because substantial evidence does not support Plaintiff's ability to work as a maid, marker, or dishwasher. (Pl.'s Mem. at 11.) Plaintiff contends that the vocational expert and the ALJ failed to explain how Plaintiff would be able to stay on task with occasional supervision during the workday, and that no employer would likely hire someone who needs supervision up to five times a day, as the vocational expert testified. (Pl.'s Mem. at 11–12.)

Defendant argues that the ALJ was entitled to rely on the vocational expert's testimony. (Def.'s Mem. at 26–27.) Defendant further asserts that the vocational expert had substantial experience in their field, and that the expert adequately explained that Plaintiff could perform unskilled work with occasional supervision, which would keep her on task. (Def.'s Mem. at 27.)

At step five, the ALJ determines whether the claimant could perform other work existing in significant numbers in the national economy, considering the claimant's age, education, work experience and residual functional capacity. §§ 404.1520(g), 404.1566. In making such determination, the ALJ poses a hypothetical individual with various limitations to the vocational expert at the hearing, asking whether jobs exist for such an individual depending on the degree of the limitations. § 404.1566(e); *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). The vocational expert's answer is relevant when the ALJ's hypothetical limitations match the claimant's substantiated impairments, as expressed in the residual functional capacity determination. *Walker*, 889 F.2d at 50.

Substantial evidence supports the ALJ's determination that Plaintiff could perform the jobs of maid, marker, or dishwasher. The ALJ determined that Plaintiff has a residual functional

24

capacity limitation of needing supervision on an occasional basis.[5] (R. at 28.) The ALJ posed this limitation of occasional supervision to the vocational expert. (R. at 94.) The vocational expert explained that unskilled positions involve supervision at the beginning of the day, mid-morning, lunchtime, mid-afternoon, and the end of the day, which adds up to "occasional supervision." (R. at 94.) The vocational expert therefore concluded that an individual could perform the job of maid, marker, or dishwasher despite needing occasional supervision. (R. at 93–95.)

Plaintiff does not point to any evidence that contradicts the vocational expert's conclusions. For instance, Plaintiff asserts in its brief to this Court that "no supervisor would allow" an employee to be "off task for 80 minutes a day," (Pl.'s Mem. at 12), but Plaintiff does not identify any evidence or expert testimony in the record supporting these conclusions. This Court is therefore left only with the vocational expert's testimony, which supports the ALJ's conclusion that Plaintiff could perform the jobs of maid, marker, or dishwasher. The ALJ thus did not err in concluding at step five that Plaintiff could perform the jobs of maid, marker, or dishwasher.

## V. CONCLUSION

For the reasons set forth above, the Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 13) be DENIED, Defendant's Motion for Summary Judgment (ECF No. 16) be GRANTED, and the final decision of the Commissioner be AFFIRMED.

Let the clerk forward a copy of this Report and Recommendation to Senior United States District Judge Robert E. Payne and to all counsel of record.

---

[5] Plaintiff does not challenge the inclusion of this limitation in the residual functional capacity determination. Instead, Plaintiff frames its fourth issue as the ALJ's error at step five, challenging the conclusion of the vocational expert and the ALJ that Plaintiff could perform the jobs of maid, marker, or dishwasher. (Pl.'s Mem. at 11.)

## NOTICE TO PARTIES

Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a de novo review of the determinations contained in the report and such failure shall bar you from attacking on appeal the findings and conclusions accepted and adopted by the District Judge except upon grounds of plain error.

/s/ _____

Elizabeth W. Hanes
United States Magistrate Judge

Richmond, Virginia
Date: __February 2, 2021__